FARMERS SAVINGS BANK OF WILTON JUNCTION, Appellee, v. C. C. KAUFMANN, Appellant.

**BANKS AND BANKING:** Officers — **Responsibility for Worthless**
1 **Loans.** The president of a bank is personally liable to the bank for loaning the funds of the bank to persons known by him to be financially irresponsible, and especially so when he secures the approval of the directors as to such loans on the repeated assurance that he is back of said loans and will see that they are paid. (See Book of Anno., Vol. 1, Sec. 8377, Anno. 10 *et seq.*)

**FRAUDS, STATUTE OF:** Operation—**Breach of Fiduciary Relation.**
2 The statute of frauds is applicable to cases in which a contractual obligation is the basis of recovery; not to cases wherein the basis of recovery is a breach of duty in a fiduciary relationship.

**Headnote 1:** 7 C. J. p. 566 (Anno.)   **Headnote 2:** 7 C. J. p. 566 (Anno.); 27 C. J. pp. 123, 302 (Anno.)

*Appeal from Cedar District Court.*—F. L. ANDERSON, Judge.

MARCH 16, 1926.

ACTION in equity, to recover a loss alleged to have been sustained as the proximate result of the defendant's breach of trust in his relation to the plaintiff-bank, as its president and director. The defendant denied the material allegations of the petition, claimed that the action was within the purview of the statute of frauds, and alleged that the loans in question were approved and ratified by the board of directors of plaintiff-bank, without direction or request on his part. A decree was entered for the plaintiff, and judgment was entered against the defendant in the amount prayed. The defendant appeals.— *Affirmed.*

*A. L. Chezam,* Special Counsel, and *Hoffman & Hoffman,* for appellant.

*F. A. Martin, Hamiel & Mather,* and *Johnson, Donnelly & Lynch,* for appellee.

DE GRAFF, C. J.—The plaintiff, Farmers Savings Bank of Wilton Junction, was duly incorporated in Iowa in 1904. The defendant, C. C. Kaufmann, since its incorporation had been its president, a member of its board of directors, and a member of its loan and examining committee, until January, 1922.

The instant action is to recover judgment in the sum of $8,144.95, with interest, and is predicated upon a breach of official duty, in that the defendant, as plaintiff's president and director, occupied a fiduciary relationship to said bank, and, by virtue of said relationship, procured the bank to accept and approve notes that otherwise would not have been accepted or approved, through his assurances to the other officers of the bank that he (defendant) was personally responsible for the indebtedness in question, and would see that said indebtedness would be paid. The facts are not in serious dispute, and this appeal simply calls for an expression of the applicable legal principle.

1. BANKS AND BANKING: officers: responsibility for worthless loans.

It is obvious that the defendant, as president and director, was in a fiduciary relationship to the bank. For all practical purposes, he was a trustee, and was legally obligated to care for the property of the bank and manage its assets in good faith. For any willful breach of trust or misapplication of the corporate funds, or for any gross neglect of or inattention to his official duties, he was responsible to the corporation. *Toledo Sav. Bank v. Johnston,* 94 Iowa 212; *City Nat. Bank v. Crow,* 27 Okla. 107 (111 Pac. 210); *Greenfield Sav. Bank v. Abercrombie,* 211 Mass. 252 (97 N. E. 897, 39 L. R. A. [N. S.] 173); *Bosworth v. Allen,* 168 N. Y. 157 (55 L. R. A. 751, with note); *Western Bank of Louisville v. Coldewey's Extx.,* 120 Ky. 776 (83 S. W. 629); 7 Corpus Juris 566.

In *Brown v. Farmers & Merch. Nat. Bank,* 88 Tex. 265 (33 L. R. A. 359), it is said:

"The directors are therefore charged with a delicate trust, from which the beneficiaries are powerless to discharge them, and which they have sworn to administer diligently and honestly, so far as the duty devolves on them. This is especially true of the president, who is not only a director, but also the chief executive officer, of the bank, and who, from the nature of his office, naturally has great influence upon the policy of the bank and the conduct of the various employees in the discharge of their duties. * * * He is presumed to know the law, and therefore knows that no action can be maintained upon his collateral promise or the promise of the minor, if the proper defenses are made, as above indicated."

We ask, therefore, Is the defendant-appellant liable to respond in damages as prayed, and to reimburse the plaintiff-bank for the loss alleged to have resulted by his conduct while acting as the president and director of the bank? What are the primary facts? The transaction giving rise to the instant suit has reference to two loans originating in March, 1918, to Charles B. Kaufmann, son of appellant. Subsequently, and in January, 1920, renewal notes were executed by Charles B. Kaufmann, as hereinafter mentioned. It is charged that, by reason of the insolvency of the maker and the uncollectibility of these notes, the bank sustained the loss in question, as a direct and proximate result of appellant's misuse of his official position.

It appears that appellant was possessed of large financial resources, and was engaged, in addition to his banking enterprise, in farming activities on a large scale. The son Charles had many dealings, through his father, with the bank, and it is shown that, in the year 1909, while a minor, he gave his note to the plaintiff bank for $4,000. In that transaction, the father's note, payable to the son, was placed as collateral to the note which the son gave the bank. In 1915, the note of the son for $1,700 was received by the bank, and credited in like manner to the appellant's account. In 1917, a note for $3,700, with appellant joining in its execution, was received by the bank, and likewise credited to the appellant's account. These notes were handled in this manner to avoid an overloan on the part of the bank to the appellant. Subsequently to the graduation of the son from the law school of the state university, he organized and promoted an auto supply company at Davenport, under the trade name of Midwest Motor Company. In this enterprise the son was helped in a very material sense by his father. The son had no personal credit, and all of the directors of the bank other than appellant testified that at no time was the son considered worthy of credit on his own account, and that the son's note for as much as $1,000 would at no time have been considered good or bankable. In February, 1918, the son drew his check on the plaintiff-bank for a large sum, and cashed the check in Davenport. This check was dishonored, and without previous arrangement, the son sent his note to the plaintiff-bank. The cashier reported these matters to the appellant, and testified that the appellant told him "to pay all checks of his son, Charles B. Kaufmann, even if they should amount to as much as $10,000." In March, 1918, the son drew two checks on the plaintiff-bank for $3,000 and $3,100, respectively, and sent to the bank his notes for like amounts. The cashier stated that, prior to accepting these notes, he submitted the matter to the appellant and was directed by the latter to pay the checks and accept the notes. At this time, he assured the cashier that the notes were good, and "were in all respects proper loans to make, and gave as the reason for appellant, not then signing the notes, his overloan condition with respect to the bank's loaning limit."

It may be stated that the cashier, F. C. Wickes, was formerly engaged as a school teacher in the district in which the son attended school, and when the bank was organized, Wickes was appointed cashier, and continued in that position until the trial of this case.  He states that he felt a peculiar sense of obligation to the defendant for his position as cashier, and frequently deferred to the defendant's judgment and directions in the matter of loans.  This is purely an incidental matter, but it serves to illustrate that the defendant exercised a dominant influence in the affairs of the bank.

In April, 1918, the appellant and his son went to the bank, and renewal notes were executed for the indebtedness owed by appellant to the bank; and at this time, two notes of $4,000 each were signed, one by appellant himself, and the other by appellant's wife, and the appellant himself signed two notes in the sum of $1,810.50 and $1,976.30, respectively.  On January 2, 1920, there was a further renewal transaction, and the notes involved in the instant suit were executed.  At this time, two notes were executed by appellant's son to the bank, one for $4,000 and the other for $2,325.46, both payable one year after date.

There can be no question, under the record, that these notes were approved by the board of directors on the assurances of the appellant that "these notes were good, and that he [appellant] was back of them, and would see that they were paid." Director Witmer testified that this statement was made by the defendant before the notes were accepted by the board.  The notes in controversy were discussed in board meeting at different times, and the appellant was requested to sign with the son, which he had previously agreed to do.  In this particular, Director Dwyer testified:

"Defendant said, 'Let it go for awhile; they're good.  It will be all right, and I will fix it up for a while.'  The board approved the loan with the assurances that C. C. Kaufmann was back of them, because he made the loan to Charles [his son].  He never consulted the rest of us."

The other directors corroborated the testimony in these particulars.

It also appears that, shortly before the organization of the

bank, in November, 1904, a resolution was duly adopted by the board providing that each director should be responsible for loans made to any person whom he brought as a borrower to the bank, or whom he recommended for a loan. This matter had been a subject of discussion at board meetings, and, under the terms of this resolution, some of the directors were required to make good certain paper which had been brought to the bank through their instrumentality. It may also be stated that the son had previously been made defendant in a law action on the two notes in question, and that judgment had been obtained against him. The judgment, however, remained wholly unsatisfied, and is shown to be uncollectible.

The trial court made a special finding in the case at bar, and determined that the loss to the bank resulted directly from a breach of the trust imposed in the defendant by reason of his office and relationship to the bank, and that, but for the assurances originally given and many times repeated by the defendant that he would hold the bank harmless on account of said loans, and his representation with respect to said loans and his participation and direction in the making thereof, the plaintiff bank would not have permitted the loaning of its funds to the defendant's son, with the resultant loss to the bank. This finding had ample support in the evidence, and we discover no reason to interfere with the judgment entered.

In conclusion, and in answer to the proposition of the appellant that the statute of frauds must defeat a recovery in this case, we make brief answer. The statute is limited to cases in which a contractual obligation is the basis of recovery, and is but a rule of evidence. The liability of the defendant is for a breach of duty in a fiduciary relationship. The notes form a part of the history of this case, but the theory of liability is not bottomed thereon.

2. FRAUDS, STAT-
UTE OF: opera-
tion: breach of
fiduciary rela-
tion.

The decree entered is—*Affirmed.*

EVANS, ALBERT, and MORLING, JJ., concur.